# IN THE COURT OF APPEALS OF IOWA

No. 20-1420
Filed February 3, 2021

**IN THE INTEREST OF R.W.,**
**Minor Child,**

**R.W., Father,**
    Appellant.
_____

Appeal from the Iowa District Court for Black Hawk County, Stephen C. Clarke, Judge.

A father appeals the termination of his parental rights.  **AFFIRMED.**

Linda A. Hall of Linda Hall Law Firm, P.L.L.C., Cedar Falls, for appellant father.

Thomas J. Miller, Attorney General, Ellen Ramsey-Kacena, Assistant Attorney General, for appellee State.

Andrew Thalacker of the Juvenile Public Defender's Office, Waterloo, attorney and guardian ad litem for minor child.

Considered by Tabor, P.J., Greer, J., and Blane, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2021).

**BLANE, Senior Judge.**

A thirteen-year-old wants no further contact with the father who exposed him to domestic violence and prefers to stay with his great-grandparents who can provide him a safe and permanent home. The child's therapist agrees that forcibly exposing R.W. to his father's presence will be detrimental to his well-being and may reverse his therapeutic progress. For these reasons and those explained below, we affirm the termination of the father's parental rights.

## I. Facts and Background Proceedings

In December 2018, the department of human services (DHS) removed R.W., then age twelve, from his mother's care due to her substance-abuse issues. At the time, his father was in prison. The father served several years for willful injury causing serious injury after assaulting his then-wife. The father was not released until nine months after R.W.'s removal from his mother. At the time of the termination hearing, R.W. had been out of parental care for nearly two years. He is in the care and custody of his maternal great-grandparents.

Even before the father was sent to prison, he and R.W. did not have a close relationship. The father also served time when R.W. was around eight years old. R.W. has never lived with the father or spent more than a few hours at a time with him. The father has a long and extensive criminal history involving inflicting violence against intimate partners and exposing R.W. to that violence. He has seven convictions for crimes involving assault or harassment. R.W. recalled hearing the father verbally and physically abuse his mother. Then, R.W. witnessed the assault that sent the father to prison.

Since his release, the father has met his parole obligations. He has a job and a place to live. He completed a substance-abuse evaluation and successfully completed an outpatient substance-abuse treatment program. But he has not resumed contact with R.W. or completed the tasks necessary to begin a reintroduction into R.W.'s life.

R.W., now almost fourteen years old, has been attending individual therapy for over a year. He has consistently maintained that he no longer wants any contact or relationship with his father. R.W. reported he witnessed his father assault an intimate partner and had always been afraid to go to his father's house for visits. He "never had a relationship ever" with his father and added, "I really don't want to either." R.W. wants the court to terminate his father's parental rights and to live permanently with his great-grandparents, whom he sees as parental figures. His great-grandparents also want to adopt him and have been approved as an adoptive family.

R.W.'s therapist, DHS caseworker, and Families First family support specialist have encouraged R.W. to keep an open mind about the possibility of reintroducing his father into his life, stressing that people sometimes make positive changes over time. To that end, the therapist recommended the father reintroduce himself to R.W. before meeting in person by writing letters that could be read in the therapeutic environment of their sessions. The father wrote one letter.[1] The

---

[1] The father sent one letter to the family support specialist, who read it to R.W. R.W. "became upset when the letter was brought up," and "did not want the letter to be read or even given to him." The family support specialist did read R.W. the letter, eventually, and R.W. pointed out throughout "what he did not believe was true." This was not the therapeutic reintroduction the therapist recommended, and R.W. did not receive it well.

therapist and DHS workers encouraged the father to maintain contact and keep aware of R.W.'s progress in therapy. But generally the father's contact was sporadic. He later complained the therapist was difficult to reach and he felt she was more on R.W.'s side. The DHS social work case manager testified the father felt contacting the therapist was not beneficial to him.

R.W.'s opinion remained the same however: he does not want contact with his father. The therapist has recommended that R.W.'s wishes be respected. Forcing contact would, in her opinion, make R.W. act out aggressively and suspend his therapeutic progress. She also opined it would be detrimental to R.W.'s emotional and mental well-being to return him to the father's care. And she found no developmental or emotional issue that might prevent him from forming a mature opinion about this topic.[2] The therapist also opined that in order to feel safe, R.W. has to know he will remain permanently with his great-grandparents. He needs to remain in therapy and address the trauma in his past.

Living with his great-grandparents has not been smooth sailing. In August, shortly after the petition to terminate parental rights was filed, a fight broke out in the great-grandparents' home with R.W. R.W. physically attacked his great-grandfather. The great-grandparents agreed to seek some additional services and support after that incident. But they maintain they want to adopt R.W. if parental rights are terminated.

---

[2] R.W. is aware that his mother's substance-abuse issues prevent her from caring for him appropriately. But he has a stronger bond with her than with the father. Still, knowing that termination of their rights must be completed before his great-grandparents can adopt him, he prefers to proceed with terminating his mother's rights as well.

The guardian ad litem filed a petition to terminate parental rights on July 29. The termination hearing was held October 20, 2020. At the time of the termination hearing, R.W. was thirteen years old. He testified, along with his therapist, and the father. The juvenile court terminated the father's parental rights, and the father appealed.[3]

## II. Scope and Standard of Review

"We review child-welfare proceedings de novo. The juvenile court's fact findings do not bind us, but we give them weight, particularly with regard to credibility. Our primary concern is the best interests of the children." *In re A.H.*, 950 N.W.2d 27, 33 (Iowa Ct. App. 2020) (citations omitted).

## III. Discussion

### a. Termination Statutory Ground

The juvenile court terminated the father's parental rights pursuant to the statutory ground of Iowa Code section 232.116(1), paragraph (f) (2020). In his petition on appeal, the father contends the State failed to offer clear and convincing evidence of the grounds for termination. Termination under paragraph (f) requires clear and convincing evidence:

> 1. The child is four years of age or older.
> 2. The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> 3. The child has been removed from the physical custody of the child's parent for at least twelve of the last eighteen months . . . .
> 4. There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.

---

[3] The court also terminated R.W.'s mother's parental rights. She does not join in this appeal.

Iowa Code § 232.116(1)(f). All the parties stipulated the first three factors were met. The father now contends the State did not prove R.W. could not be returned to his care.

The evidence is clear and convincing that R.W. could not be returned to the father's custody at the time of the termination hearing. *See In re A.M.*, 843 N.W.2d 100, 111 (Iowa 2014) (defining "at the present time" to mean at the time of the termination hearing). Through the life of the case, the father wrote his son one letter. He never had visitation or even phone calls. The father did not follow the therapist's recommendations on reintroducing himself to his son. They have no relationship, and R.W., justifiably, wants none. He expressed fear of spending time with his father and explained he does not view him as a father figure. The therapist testified R.W. suffered trauma in overhearing and witnessing the father's domestic violence against his intimate partners, including R.W.'s mother. The therapist also recommended the father write letters because forcing contact would be detrimental to R.W.'s emotional and mental well-being, a task the father did not complete.

In his testimony, the father admitted it would be impossible to return R.W. to his care if R.W. refused contact with him. He testified he was committed to restoring their relationship. But he agreed this would take months if not years.

The father argues the DHS and the great-grandparents have influenced R.W. to turn against him, but the record does not support that. The testimony from the therapist and DHS workers shows all parties have encouraged R.W. to consider reunification. R.W. is old enough to understand the options and discuss them with his own attorney and to express a mature opinion about what he wants.

It is somewhat unclear how much weight we ought to give to the preference of the child in a termination-of-parental-rights proceeding. *See In re A.R.*, 932 N.W.2d 588, 591–92 (Iowa Ct. App. 2019) (applying the framework for child preference from marriage dissolution and custody cases in discussion of statutory exception provision under Iowa Code section 232.116(3)(b)). Courts consider the child's age and maturity, the strength of their preference, and their reasons, among other factors. *Id.* at 592. In this case, all the factors and relevant evidence weigh in favor of giving some weight to R.W.'s opinion. But even without considering R.W.'s personal preferences, the record is clear and convincing that R.W. could not be returned to his father's care without suffering adjudicatory harm to his mental and emotional well-being. So we find the statutory ground for termination under paragraph (f) has been met.

### b. Reasonable Efforts

Iowa Code section 232.102(7) requires the DHS to "make every reasonable effort to return the child to the child's home as quickly as possible consistent with the best interests of the child." *See In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000). "The State must show reasonable efforts as a part of its ultimate proof the child cannot be safely returned to the care of a parent." *Id.* The reasonable-efforts requirement is not "a strict substantive requirement of termination." *Id.* But when relying on paragraph (f) as the ground for termination, as it did here, the State must show the DHS made reasonable efforts toward reunification as part of its ultimate burden of proof. *See In re L.T.*, 924 N.W.2d 521, 527 (Iowa 2019).

The father contends the DHS failed to provide services to promote and facilitate visitation with R.W. Again, the father's failure to complete the task of

providing letters for the therapist to read R.W. in their sessions determined his own progress toward reuniting with his son. We find no failure to make reasonable efforts.

### c. Best Interests of the Child

The father next contends it is not in R.W.'s best interests to terminate his parental rights. In making the best-interests determination, we give primary consideration to the child's safety, the best placement for furthering their long-term nurturing and growth, as well as their physical, mental, and emotional condition and needs. Iowa Code § 232.116(2); *see In re P.L.*, 778 N.W.2d 33, 37 (Iowa 2010). Safety and the need for a permanent home mark the "defining elements" in a child's best interests. *In re J.E.*, 723 N.W.2d 793, 802 (Iowa 2006) (Cady, J., concurring specially).

Because the father never reestablished contact with R.W., he did not demonstrate he could provide a safe or stable home or minister to R.W.'s physical or mental needs. In contrast, the great-grandparents have been a safe and stable home for R.W. since his removal. They have supported him in therapy, and R.W. is now attending school, participating in sports and activities, and maintaining friendships under their guidance. More importantly, because the father has not shown himself to be capable of doing the same, termination of his rights and permanency through adoption are now the best means for ensuring R.W.'s safety and long-term well-being.

### d. Statutory Exception for Child in Guardianship

Finally, the father argues termination is not necessary under Iowa Code section 232.116(3)(a), which allows the court to forego termination if "[a] relative

has legal custody of the child."[4] But foregoing termination would not promote stability or provide permanency for R.W. *See In re R.S.R.*, No. 10-1858, 2011 WL 441680, at *4 (Iowa Ct. App. Feb. 9, 2011) ("So long as a parent's rights remain intact, the parent can challenge the guardianship and seek return of the child to the parent's custody."). There is no reason to believe that the father could successfully resume care or custody of R.W. at any time before he becomes an adult. And R.W.'s therapist's recommendation and advice is that stability and permanency living with his great-grandparents is in his best interests. We conclude the placement with them is not grounds to apply the exception to termination.

Finding no grounds for reversal, we affirm the juvenile court's decision.

**AFFIRMED.**

---

[4] To the extent the father argues for a guardianship in the great-grandparents rather than termination, and it is not clear from his petition that he does, we reject the suggestion. "[A] guardianship is not a legally preferable alternative to termination." *In re A.S.*, 906 N.W.2d 467, 477 (Iowa 2018). Although section 232.104(2)(d) allows for the establishment of a guardianship as a permanency option, section 232.104(3) requires a judicial determination that the "planned permanent living arrangement is the best permanency plan for the child." Given R.W.'s lack of a relationship with his father, we find the uncertainty of a guardianship would not be warranted nor would it promote R.W.'s best interests.